## Case No. 9,884.

### MOTTE v. BENNETT.

[2 Fish. Pat. Cas. 642.] [1]

Circuit Court, D. South Carolina. June. 1849.

CONSTITUTIONAL LAW—TRIAL BY JURY—PATENTS—ACTION FOR INFRINGEMENT—INJUNCTION—PRACTICE IN EQUITY.

1. The seventh amendment to the constitution of the United States is a provision exclusively for cases at common law.

2. Section 14 of the act of July 4, 1836 [5 Stat. 123], is, in terms, exclusively for actions

---

[1] [Reported by Samuel S. Fisher, Esq., and here reprinted by permission.]

at law for damages, and the treble amount which the court may give, over the sum found by a jury, can not, in any case, be given by a court of chancery.

3. If each infringement of the patent were to be made a distinct cause of action, the remedy would be worse than the evil. The inventor might be ruined by the necessity of perpetual litigation, without ever being able to have a final establishment of his rights.

4. The plaintiff could have no preventive, at law, to restrain the future use of his invention injuriously to his title and interest.

5. By discretion is meant an obligation upon judges in chancery to determine each case, as nearly as it can be done, by what has been the course in chancery in like cases. It never means will or authority in the judge, but both restrained by decided cases or long standing rules.

6. The rules in respect to injunctions to restrain a party in a suit at law, whatever may be the character of such a suit—for instance, to restrain an action of ejectment—differ materially from those which govern courts in granting or refusing injunctions in cases of invention and copyright.

7. A jury trial of the alleged infringement has not been a prerequisite for the action of the court, in England, since 1761.

8. In England, for more than eighty years, injunctions, both provisional and perpetual, have been granted, in the first instance, in cases of copyrights and patents; and where they have been perpetual in the first instance, they have been made so without the intervention of a jury to try the question of title or infringement, in all cases where the court was fully satisfied with the proof, notwithstanding the defendants may have denied in their affidavits or answers the originality of the invention or the sufficiency of the specification. The practice in the courts of the United States, in respect to granting injunctions in patent cases, has always been that of the English chancery.

[Cited in Brown v. Hinkley, Case No. 2,012.]

9. In equity, where the case is clear and without reasonable doubt, where the bill states a clear right to the thing patented, which, together with the alleged infringement, is verified by affidavit, and where the plaintiff has been in possession of it, by having sold or used it, in part or in the whole, the court will grant an injunction and continue it till the hearing or further order, without sending the plaintiff to law to try his right.

[Cited in Brown v. Hinkley, Case No. 2,012.]

10. The rule as to injunctions applies as well to a bill brought by an assignee as to one brought by the original inventor.

This was bill in equity [by Joshua W. Motte,] filed to restrain the defendant [Washington J. Bennett] from infringing letters patent for an "improvement in the method of planing," etc., granted to William Woodworth, and more particularly referred to in the report of the case of Foss v. Herbert [Case No. 4,957].

W. H. Seward, for complainant.
Petigru & Memminger, for defendant.

WAYNE, Circuit Justice, after examining the question of infringement, and one or two preliminary points relating to local practice, proceeded as follows:

After the court had overruled the motion of the defendant's counsel to conclude the argument, Mr. Memminger proceeded in it, and stated three propositions.

First. "That by the seventh amendment to the constitution the alleged infringement should be tried by a jury." That amendment is a provision exclusively for cases at common law. It is: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined, in any court of the United States, than according to the rules of the common law."

That it is meant exclusively for suits at common law, has been several times ruled by the supreme court of the United States. Besides, all the legislation of congress concerning trials of suits in the courts of the United States, makes the same distinction between trials of suits at common law and of those in equity and admiralty. It could not be otherwise, as the distinction is made in section 2, art. 3, of the constitution, between "cases at law and equity." And every case in which a jury shall be called, in the courts of the United States, is provided for, either in the constitution as it came from the convention, or in the subsequent amendments. They are: "The trial of all crimes, except in cases of impeachment, shall be by jury." Section 2, art. 3. "No person shall be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury." 5th amendment. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." 6th amendment. The other instance is the seventh amendment, already cited. We will only further remark upon this point that section 14 of the act of July 4, 1836, which was cited on the argument in connection with the constitutional amendment, has no bearing upon it. That section is in terms exclusively for actions at law for damages, and the treble amount which the court may give over the sum found by a jury, can not, in any case, be given by a court of chancery. Indeed, if any one thing could show more plainly than another, that a trial by a jury in a patent cause was not thought the best way to compensate a patentee for an infringement of his patent, it is this legislative authority given to the court to give a threefold amount over the sum found by the verdict of a jury.

The second proposition, that the bill of the complainant could not be maintained, because he had an adequate remedy at law, can not be sustained.

The principle upon which courts of equity have jurisdiction in patent cases, and upon which injunctions are granted in them, is not that there is no legal remedy, but that the law does not give a complete remedy to those whose property is invaded; for if each infringement of the patent were to be made a distinct cause of action, the remedy would

be worse than the evil. The inventor or author might be ruined by the necessity of perpetual litigation, without ever being able to have a final establishment of his rights. Hogg v. Kirby, 8 Ves. 223; Harmer v. Plane, 14 Ves. 132; Lawrence v. Smith, Jac. 472.

In addition to this consideration, the plaintiff could have no preventive at law to restrain the future use of his invention or the publication of his work, injuriously to his title and interest. Besides which, in most cases of this sort, the bill usually seeks an account, in the one case, of the books printed, and, in the other, of the profits which have arisen from the use of the invention, to the persons who have pirated the same. And where the right has been already established under the direction of the court, there this account will, in all cases, be decreed as incidental to the other relief which may be obtained prospectively by a perpetual injunction. Mit. Eq. Pl. (by Jeremy) 138; Hogg v. Kirby, 8 Ves. 223, 224; Universities of Oxford and Cambridge v. Richardson, 6 Ves. 705, 706; Baily v. Taylor, 1 Russ. & M. 73.

This brings us to the third proposition in the argument. It was that a court of equity had no discretion to decree an injunction upon an alleged infringement of a patent unless that question had been first passed upon by a jury, and that such was the meaning of that provision in section 17 of the act of July 4, 1836, which gives to the circuit courts power "to grant injunctions according to the course and principles of courts of equity." By discretion, of course, is meant an obligation upon judges in chancery to determine each case, as nearly as it can be done, by what has been the course in chancery in like cases, as well as to prescribe the practice to be observed in each case, and the principles by which the right is to be determined between the parties in controversy. It never means will or authority in the judge, but both, restrained by decided cases or long standing rules.

The point then is, what have been the course and principles of courts of equity in granting injunctions for alleged infringements of inventions. It is not denied, nor can it be denied, that the infringement is regularly and fully alleged in this case, with all those substantial averments and affidavits which the practice in courts of equity requires.

Before showing what the course in equity has been, in granting such injunctions, it is proper to state what an injunction is, in the meaning and practice of a court of equity. It is either provisional or perpetual. The first being common or special—common, such as are granted upon the defendant's default either in appearing or answering, and are only applicable to restrain proceedings in the courts of common law—special, when granted upon the special grounds arising out of the circumstances of the case. Injunctions of this description are issued sometimes on the merits disclosed by the answer, sometimes on affidavits before the answer is filed, and sometimes even without notice and before the defendant has appeared. Beames, Orders Ch. 16; Perk. Daniell, Ch. Prac. 1810. A perpetual injunction is a part of the decree made at the hearing upon the merits, whereby the defendant is perpetually inhibited from the assertion of a right, or perpetually restrained from the commission of an act which would be contrary to equity and good conscience. Id. Such is the injunction sought for in this case.

From this statement of what an injunction is, and the different kinds of them for different purposes, it is obvious that, in any investigation on an application for one, the object of it must first be considered, in order to make to it a proper application of decided cases. The rules in respect to injunctions to restrain a party in a suit at law, whatever may be the character of such suit, for instance to restrain an action of ejectment, as was the case in Brown v. Newall, 2 Mylne & C. 571, cited by counsel, differ materially from those which govern courts in granting or refusing injunctions in cases of invention and copyright. In these there are requisites and allowances peculiar to themselves, which do not exist and are not permitted in any other case of an application for an injunction. Daniell, Ch. Prac. 186. It is asked in this case on account of an infringement of an invention. It can only be granted according to the course of equity, after the complainant in the case has brought his case within that course.

Is a jury trial of the alleged infringement a prerequisite for the court's action? It has not been so in England, as a rule, since 1761. In Dodsley v. Kinnersley, Ambl. 403, in which the expressed point was raised upon a bill for an injunction to restrain the defendant from printing Dr. Johnson's Rasselas, and for an account of the profits made by having printed it, Sir Thomas Clarke, master of the rolls, said: "I would have it understood that there is no impropriety in the application to this court. The method of proceeding in these cases has been changed. Formerly, in the case of a patentee, on opening the case, he partly was sent to law to establish his right, and then came back for an account." We see also, from an anonymous case from Vernon, cited by Drewry on Injunctions, a work relied upon by the defendant, that the practice had been as was stated by the master of the rolls in Dodsley v. Kinnersley. But we also see, in the same work, that at the present day it is not generally necessary that the plaintiff should establish his right at law, in order to come into equity, the right appearing prima facie on the record by the letters patent. Drew. Inj. 221, margin, for which he cites Mitf. Eq. Pl. 147, Hicks v. Raincock, Dickens, 647, and 1 Ves. Sr. 476. In truth, what was the practice in England in respect to patents, and for reasons which we shall state before we conclude, has not been the practice there for more than eighty

years. Daniell, as we have shown Drewry does, says: "On both occasions of patents and copyrights, it was formerly the practice, on opening the case, to send the party to law to establish his right. But, on both occasions, the practice has been altered, and now, when the right of the patentee appears on the record, and the patent has been granted for some length of time, and the public has permitted the exclusive and undisturbed possession of it for several years, under such circumstances the court will interpose by injunction in the first instance without putting the party previously to establish his right in an action at law." For this he cites Boulton v. Bull, 3 Ves. 140; Harmer v. Plane, 14 Ves. 133; and Hill v. Thompson, 3 Mer. 622. In such cases, however, there must be satisfactory evidence of exclusive possession by the patentee, and where this is wanting, the court will not interfere without a trial at law. Collard v. Allison, 4 Mylne & C. 487. And what in England is meant by exclusive possession, we know from what was said in the case of Universities of Oxford and Cambridge v. Richardson, 6 Ves. 689. There Lord Eldon denied the rule stated by the judges in Millar v. Taylor, 4 Burrows, 2377, as to injunctions, and referring to Boulton v. Bull, and several other cases, stated the principle, particularly in regard to patents, to be, that if a party gets his patent and puts his invention in execution, and has proceeded to a sale, that may be called possession under it. However doubtful it may be whether the patent can be sustained, equity will hold that possession under a color of title, is ground enough to enjoin and to continue the injunction till it is proved at law that it is only color and not real title." Of course, when the patent or the infringement of it is already before a jury, as was the case in Collard v. Allison, 4 Mylne & C. 487, equity will not interfere to enjoin while it is so.

We will now notice the cases which were cited by counsel in support of the practice for a jury trial. Some of them are inapplicable, because they do not relate to patents or copyrights, and we have shown that injunctions in such cases are controlled by rules exclusively applicable to them. When carefully examined, some of the other cases maintain the opposite doctrine to that contended for by the counsel for the defendant. No one of them maintains the practice of the right, of a party charged with the infringement of a patent, when he denies it either by affidavit or by answer, to a jury trial, except the case of Millar v. Taylor, 4 Burrows, 2400, decided in 1769, which we have seen is an overruled case by several subsequent decisions, and is denied by Lord Eldon, in Hill v. Thompson, 3 Mer. 626, ever to have been the rule of practice in patent or copyright cases.

The cases of Lord Tenham v. Herbert, 2 Atk. 483, and of Brown v. Newall, 2 Mylne & C. 571, were for the trial of title, the first to an oyster fishery, the other to land. In the first, Lord Hardwicke refused to interfere by injunction to settle a right of fishery between the lords of two manors; and Brown v. Newall was an application for a common injunction to restrain proceedings at law in a case of ejectment. Boulton v. Bull, 2 H. Bl. 492, was an action on the case for infringing a king's patent and the court said, upon a point raised whether a model was or was not necessary for the purpose of showing an infringement, that it was not the province of a judge in a court of law to decide an infringement, but that it was a question for the jury, and that if they could understand the case without a model or drawing, there was no rule which made one indispensable. But it will be found also that the court, in that case, recognized the rule in chancery, "that when the right of the patentee appears on the record, and the patent has been granted for some length of time, and the public has permitted the exclusive and undisputed possession of it for several years, under such circumstances, equity will interfere by injunction, in the first instance, without putting the party previously to establish his right in an action of law." The case of Blanchard v. Hill, 2 Atk. 485, was a controversy about the use of the same stamp upon cards, the stamp being stated to have been appropriated by the complainant under a charter granted by King Charles the First. The injunction asked for was, of course, denied. It was the first application of the kind ever made to a court of chancery. It was a monopoly granted by the king, had never been sanctioned by an act of parliament, and, in these cases, as we will hereafter show, the court never granted an injunction until the right claimed had been established at law. The case of Motley v. Downman, 3 Mylne & C. 14, was another case of a party using upon his goods the mark of another, and not a patent case. It was a case, too, in which the complainant could not claim anything by patent or charter. It was, therefore, a pure legal right in controversy between the parties, in which nothing exclusive could be claimed until it was settled at law. In such case, before a court of chancery will interfere by injunction, it must appear that the party suffering from the usurpation of his mark by another, is suffering from the artifice, fraud, or misrepresentation of the latter, in selling goods with the mark of the former of an inferior quality, by which the first may be injured in his sales and manufactures.

The case of Sheriff v. Coates, 1 Russ. & M. 159, was not a patent case, though it was analogous, on account of the exclusive right given to calico printers in their designs. In that case the lord chancellor said: "It is essentially necessary that the party applying should establish the originality of the pattern in a court of law." But why? Because as the calico printers by the statute have an exclusive right in their designs for two months

only, they can not have either that possession or that length of enjoyment which a patentee may have, from the longer continuance of his right. and which must appear before equity will restrain an infringement by an injunction. The case of Saunders v. Smith, 3 Mylne & C. 728, was a case altogether different from what the learned counsel who cited it in argument supposed it to be. It states, in terms, the practice of courts of equity in granting injunctions, coincidently with what we have said the practice is, and has been for almost a hundred years. "The office of the court is consequent upon the legal right, and it generally happens that the only question the court has to consider is, whether the case is so clear and so free from objection upon the grounds of equitable consideration that the court ought to interfere by injunction without a previous trial at law, or whether it ought to wait till the legal title has been established. That distinction depends upon a great variety of circumstances, and it is utterly impossible to lay down any general rule upon the subject by which the discretion of the court ought in all cases to be regulated. The court always exercises its discretion, as to whether it will interfere by injunction before the establishment of the legal title."

The case of Bacon v. Jones, 4 Mylne & C. 437, turned entirely upon the omission of the plaintiffs to apply for an interlocutory injunction for four years, while the cause was pending. And the lord chancellor stating what the course might be upon an application for an interlocutory injunction, says, as a matter of opinion but not as a rule of practice, that in such a case it is a more wholesome practice to direct the plaintiff to establish his title at law, suspending the injunction until the result of the legal investigation. But he concludes with this declaration in respect to what the practice is in such cases: "Which of these courses ought to be taken must depend entirely upon the discretion of the court according to the case made. When the cause comes to a hearing, the court has also a large latitude left to it, and I am far from saying that a case may not arise, in which, even in that stage, the court will be of opinion that the injunction may properly be granted without having recourse to a trial at law. The conduct and dealings of the parties, the frame of the pleadings, the nature of the patent right and of the evidence by which it is established—these and other circumstances may combine to produce such a result, although this is certainly not very likely to happen, and I am not aware of any case in which it has happened. Nevertheless, it is a course unquestionably competent to the court, provided a case be presented which satisfies the mind of the judge that such a course, if adopted, will do justice between the parties."

We have now shown what the old practice was in England in respect to a jury trial, before a court of equity would interfere to protect a patent by injunction, also the change which took place in that practice in England more than eighty years since, and that the practice now in England is in conformity with that change.

Before proceeding to show what the practice has uniformly been in the courts of the United States which have jurisdiction of patent causes, and that the old practice in England never prevailed in them, we would venture to suggest the causes which led to the old practice in England. When those causes ceased to exist, that practice was discontinued, and these causes never existed in the United States.

Besides the caution with which courts of equity have always used their power to grant injunctions of any kind, there has been at all times, in the chancery of England, a wholesome jealousy of all monopolies and patents granted by the king, on account of the legal abuse of this prerogative. It is a singular thing, but history shows, that while monopolies and special immunities contributed to revive commerce in Europe, it was the abuse of them which led to its freedom.

First, corporate bodies were formed to protect the interests of their members, then there were associations of towns for the same purpose, and the Hanseatic league was formed in the twelfth century for promoting commerce, and the interests of the cities in the league.

Godson properly says: "Europe was soon astonished by the wealth which it rapidly gathered, and the immense power, its inseparable concomitant, which it quickly obtained." England was in a great degree enlightened by it; and then began in England those privileges and monopolies which, aiding commerce for a time, became oppressive as soon as the kings of England supplied their pecuniary wants (which parliament refused to satisfy) by an abuse of prerogative in conferring exclusive grants. Elizabeth abused it more than any English monarch. But the complaint of her people compelled her to cancel the most oppressive patents which she had granted, allowing such only to be continued as time had shown were not hurtful to the public interests, and which did not restrain the sale of commodities in daily use.

Mr. Macaulay is not full enough in his account of this strife of liberty with usurpation: but he rightly says in his own compendious way: "The house of commons met in an angry and determined mood. It was in vain a courtly minority blamed the speaker for suffering the acts of the queen's highness to be called into question. The language of the discontented party was high and menacing, and was echoed by the voice of the whole nation. There seemed for a moment to be some danger that the long and glorious reign of Elizabeth would have a shameful and disastrous end." But the queen avoided the pressure by yielding to it in a great measure, being afraid that parliament would abrogate the exercise of such power, as it afterward did by St. 21 Jac. 1., c. 3. By that statute it

was so much lessened that the crown could only make a grant or exclusive privilege in cases of new inventions. That, it was conceded, the king could do by the common law, to secure to inventors the exclusive use and sale of their discoveries.

On the statute of James is founded all the law in England as to patents and inventions, both in the courts of common law and in equity. From the time of the passage of that act, notwithstanding the attempts which were made by Charles I. to disregard it, and to revive the exercise of the power in the crown to grant monopolies, the judges in England followed the lead of popular feeling so far as to place a jury between the exercise of prerogative and liberty, whenever they could do so with safety to themselves. It must be remembered that these offices were then held at the will of the crown. The statute had taken the investigation of patents from the star chamber. They were afterward to be heard, tried, and determined, "by and according to the common law of the realm and not otherwise." And thus came, as remedies for the infringement of patents, the action at law for damages, and proceedings in equity for an injunction and an account of profits.

Anciently, however, and before the star chamber was established, the chancellor had jurisdiction in cases of patents and charters according to the usual practice, without the intervention of juries. When the statute was passed, the practice in chancery, co-operating with the parliament to restrain the crown, was, without ever having been reduced to the precision of a rule, such as we shall now state.

If an injunction was applied for in a case of a monopoly or a patent, the first inquiry was, is the monopoly or patent a grant from the king or by act of parliament? If the former, before a court would grant it, the right to it was heard by a jury; if by parliament, and the right was not contested for any of those causes which, by the common law, would invalidate it, the court acted without a trial of the right by a jury, in this way aiding the parliament, during the reigns of James and Charles, to confine the privileges of the crown within the limits of the common law. And the courts did this with more constancy and courage in cases of the king's patents, because, by the statute, only such were good as were not contrary to the common law. But even then, in a clear case of the infringement of a king's patent, the chancellor would grant injunctions to restrain infringements, though the continuance of them was made dependent upon the finding of a jury, where the originality of the invention was denied, and the defendant asked that it might be tried by a jury. And that was done in one of two ways, either by sending the plaintiff to a court of law to establish his right, or by a feigned issue in the court of chancery. And so the practice was, as we have stated it, in respect to all actions in cases of patents, until the spirit of English liberty rose above all the restraints of prerogative over commerce, and was no longer apprehensive of such usurpation. The courts thereupon partook of this triumph, and as the practice in chancery, of trying the title under a king's patent, had been adopted more for protecting the public from usurpation than for the protection of individuals, it was discontinued in all cases of alleged infringements of patents where the title of the patentee was clear beyond a reasonable doubt, and where he had had the possession and use of his machine without other interference than such as had arisen from the wrongful use of it, or from the piracy of the whole under the pretense of some improvement or addition. And the records of the English chancery will show that for more than eighty years, injunctions, both provisional and interlocutory, and perpetual, have been granted in the first instance in cases of copyrights and patents; and that where they have been perpetual in the first instance, they have been made so without the intervention of a jury to try the question of title or infringement, in all cases where the court was fully satisfied with the proof, notwithstanding the defendants may have denied in their affidavits or answers the originality of the invention or the sufficiency of the specification.

It now only remains for us to state the course pursued in the courts of the United States in granting injunctions in patent cases.

The reasons for the early practice did not exist at any time in this country. That practice in England had been changed before the war began which ended in our separation from the mother country. The constitution of the United States was not formed until thirty years after that change had taken place. Under the constitution, courts have been established with jurisdiction exclusive, and concurrent with that of the courts of common law, in cases in which those courts can not give full remedies for the preservation of every equitable right. They have as large a jurisdiction as the courts of chancery in England. Their practice in all matters is the same, except where differences exist from legislation, or by the rules of the supreme court.

The practice in them, in respect to granting injunctions in patent cases, has always been that of the English chancery, always cautiously exercised. frequently followed, however, in every part of the United States, without injury to legal rights, and never complained of, as far as we know, until it was urged on the argument of this cause, that for the court to grant an injunction for the infringement of a patent, without a trial by a jury, when the infringement was denied by the defendant. was an invasion of the right of trial by jury.

If it be so, it is an evasion of very long standing, both in England and in the United States. and one with which the courts in this

day can not be charged. We have shown that the practice has been the same, without any variation, in England since 1701.

Mr. Justice Washington said, in Ogle v. Ege [Case No. 10,462], decided in 1826: "I take the rule to be, in cases of injunctions in patent cases, that where the bill states a clear right to the thing patented, which, together with the alleged infringement, is verified by affidavit, if the patentee has been in possession of it, by having used or sold it in part, or in the whole, the court will grant an injunction, and continue it until the hearing, or further order, without sending the plaintiff to law to try his right. But if there appears to be a reasonable doubt as to the plaintiff's right, or the validity of the patent, the court will require the plaintiff to try his title at law." And Curtis, in his work on Patents (section 328), citing Neilson v. Thompson, Webst. Pat. Cas. 277, says: "It seems to be the result of all the authorities that there is a prima facie right to an injunction, without a trial at law, upon certain things being shown, namely, a patent, long possession, and infringement." The case of Ogle v. Ege [supra] is, in its particulars, the case at bar.

The case of Isaacs v. Cooper [Case No. 7,096], previously decided by the same learned judge in 1821, and cited in argument as against the rule subsequently laid down in the case of Ogle v. Ege, is so far from being so, that it in words anticipates the rule as laid down in that case. "The practice of the court of equity upon motions of this kind is to grant an injunction upon the filing of the bill, and before a trial at law, if the bill states a clear right and verifies the same by affidavit. If the bill states an exclusive possession of the invention or discovery for which the plaintiff has obtained a patent, the injunction is granted, although the court may feel doubts as to the validity of the patent. But if the defects in the patent or specification are so glaring that the court can entertain no doubt as to that point, it would be most unjust to restrain the defendant from using a machine or other thing which he may have constructed, probably at a great expense, until a decision can be had at law." And the injunction in that case was denied upon four separate grounds, each of them being within the rule stated in the case of Ogle v. Ege, all of which must appear to exist before the court will grant the injunction.

In the year 1812, the point we are here considering was discussed with as much precise learning as it has ever been, in the case of Livingston v. Van Ingen, 9 Johns. 507. Justices Yates, Thompson, and Kent, all concur in granting an injunction, without sending the plaintiff to a court of law, or awarding a feigned issue to try his right, on the question of infringement, by a jury. Mr. Justice Yates says: "The right being claimed under an express grant by the statute, creating the forfeiture, and no doubt remaining of the existence of the boats, the presumption was irresistible that they navigated contrary to the statute, and that the property was in the appellants." Then, after noticing the cases of Blackwell v. Harper, 2 Atk. 92, Anon., 1 Ves. Sr. 476, Boulton v. Bull, 3 Ves. 140, and Harmer v. Plane, 14 Ves. 130, he says: "From these and numerous other cases, no doubt can exist that the injunction in this case ought to have issued." Mr. Justice Thompson says: "Where the right is clear, an injunction is never refused; as when the right claimed appears on the record, or is founded on an act of parliament, it is a matter of course to grant an injunction, without first obliging the party to establish his case at law. In the case of Blanchard v. Hill, 2 Atk. 485, Lord Hardwicke said: "That in cases of monopolies, the rule that the court had governed itself by was, whether there was any act of parliament under which the restriction was founded. But the court will never establish a right of this kind claimed under a charter only from the crown, unless there has been an action to try the right at law. This will be found on examination to be a governing distinction running through the numerous cases cited in the argument. And whenever an injunction has been refused, the right was claimed under a patent from the crown, and that right considered doubtful." Kent, then chief justice, says: "If the legal right be in favor of the appellants, the remedy prayed for by their bill is a matter of course. Injunctions are always granted to secure the enjoyment of statute privileges of which the party is in the actual possession, unless the right be doubtful. This is the uniform course of the precedents. I believe there is no case to the contrary; and the decisions in the English chancery on this point were the same before, as since, the American Revolution." Then, citing many cases from the English books, from 1740 to the cases of Universities of Oxford and Cambridge v. Richardson, 6 Ves. 707, and of Harmer v. Plane, 14 Ves. 130, the learned judge says: "I cite these cases to show that the law has been settled in England for the last seventy years at least, and has been preserved in a steady uniform course under a succession of their ablest and wisest men. The principle is, that statute privileges, no less than common law rights, when in actual possession and exercise, will not be permitted to be disturbed until the opponent has fairly tried them at law, and overthrown their pretension."

The federal courts in this country have thought so, for under the patent laws of congress they have protected the right by injunction. The cases cited from the federal courts are those of Morse v. Reed [Case No. 9,860], decided by Chief Justice Ellsworth, in 1796, and of Whitney v. Fort [Id. 17,587], decided in the circuit court for the district of Georgia, by Mr. Justice Johnson,

in the year 1806. In both of those cases injunctions were granted in the first instance, and subsequently made perpetual, without trials by jury. The last case is as decisive of what that eminent jurist, Mr. Justice Johnson, thought and adjudicated to be the practice in patent cases, as any other on record. In every particular of fact and pleading, that case and the one before us are alike, except that the defendants, in their answer in the former case, admitted that the plaintiffs had received a patent, but contested it for the want of originality. In this case the defendant does not deny that the plaintiff has received a patent, but puts him to the proof of it, and then denies its validity, alleging that the thing patented was not original.' The cases then became alike, in that particular, so soon as the plaintiff in this case established that he had received a patent from the United States, nothing being left in controversy but the question of originality.

The counsel in Whitney v. Fort [supra], supposing from the answer that the denial of originality would induce the court to order a feigned issue to try the question, actually prepared and joined issue in one without having taken such an order from the court. But it was not tried, for the court thought that the patent, possession, and use made such a proceeding unnecessary, and Judge Johnson having granted an injunction, in the first instance, gave an order for a perpetual injunction, his associate, Judge Stephens, concurring. It certainly can not be necessary, with such an array of authority, to cite other cases from our own jurisprudence to show what has been the practice in the United States courts, in granting injunctions to restrain infringements of patent rights, or rather to show how much that practice was misunderstood on the argument of this cause, for, until that argument was made, we were not aware that the practice was considered doubtful by any portion of the profession in the United States. We can only account for the misapprehension of it in this instance, by supposing that the difference of proceeding in a patent case at law and in equity was overlooked. We are indebted to Phillips, in his work on Patents (chapters 20–24), for a more compendious, and, we think we may say, more accurate statement of these differences than has been given by any other elementary writer.

At law the question of infringement or no infringement is generally, if not invariably, for the jury. Phil. Pat. 431. The instances of exception, verified by cases, are well stated in that work, and we need not repeat them.

In equity, where the case is clear and without reasonable doubt, where the bill states a clear right to the thing patented, which, together with the alleged infringement, is verified by affidavit, and where the plaintiff has been in possession of it, by having sold or used it in part or in the whole, the court will grant an injunction and continue it till the hearing or further order, without sending the plaintiff to law to try his right. And the rule applies as well to a bill brought by an assignee as by the original inventor.

What, then, finally, is the case before us? It is a bill brought by an assignee, with proof of the assignment to him, for the exclusive use of it in Charleston district, of a machine originally patented to William Woodworth, subsequently renewed by a board of commissioners, in conformity with law, and afterward extended by an act of congress, under which the assignment to the plaintiff is made. He comes before the court, then, not only with a patent granted in the usual form, but with a statute right, which, having been brought to the notice of the court, the court must consider as conclusive of title. This and the other requisites of possession and use concurring from the testimony in the case, and the defendant having voluntarily abstained from going into any proof of the averments in his answer in respect to the originality of the patent, the want of a sufficient specification, and that the last specification attached to the patent is for a different machine from that first specified by the patentee, we are left without any alternative, as well from the proofs in the case on the part of the plaintiff, as from the omission of all proof by the defendant to maintain his case, except to award against him a perpetual injunction.

The originality of Woodworth's invention, like that of Whitney's cotton gin, from repeated trials in court, from the many attempts which have been made to pirate it, and from the work which it does, so efficiently and so differently from what was ever done before by any planing machine, is now almost a universally received opinion; so much so, that the language of Mr. Justice Johnson, in the case of Whitney v. Fort, is very appropriate. Two witnesses were, in that case, produced on the stand to prove that the invention was not original; one of them said he had seen in England, seventeen years before, "a teazer or devil" like it, the other that he had seen a machine like it in Ireland. The learned and lamented predecessor of one of us in this court said in reply to that evidence: "There are circumstances within the knowledge of all mankind, which prove the originality of this invention more satisfactorily to the mind than the direct testimony of a host of witnesses. The cotton plant furnished clothing to mankind before the age of Herodotus. The green seed is a species more productive than the black, and by nature adapted to a much greater variety of climate, but by reason of the strong adherence of the fiber to the seed, without the aid of some more powerful machine for separating it than

any formerly known to us, the cultivation of it could never have been made an object. The machine of which Mr. Whitney claims the invention, so facilitates the preparation of this species for use, that the cultivation of it has suddenly become an object of infinitely greater importance than that of the other species ever can be. Is it then to be imagined that if this machine had been before discovered, the use of it would ever have been lost or could have been confined to any tract of country left unexplored by commercial enterprise?"

The last sentence is peculiarly appropriate to Woodworth's planing machine, for it now does, in every part of the civilized world, that which could not be done before with the same efficiency by machinery, and which is not here done in any degree by any machine which has been before the courts of the United States, unless by piracy of Woodworth's combination.

[For other cases involving this patent, see note to Gibson v. Van Dressar, Case No. 5,402; Bicknell v. Todd, Id. 1,389; Woodworth v. Cooke, Id. 18,011; Same v. Curtis, Id. 18,013; Same v. Edwards, Id. 18,014; Same v. Hall, Id. 18,016; Same v. Rogers, Id. 18,018; Same v. Stone, Id. 18,021; Same v. Weed, Id. 18,022.]